[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action for dissolution of marriage. The following facts are found:
1. The plaintiff, Laurene A. Arens, and the defendant, Peter W. Arens, were twice married. CT Page 1157
2. Their first marriage was in May 1981. That marriage terminated in dissolution in May 1990.
3. There are two minor children issue of this first marriage, Matthew, born September 30, 1981, and Michelle, born December 16, 1985.
4. The parties remarried on October 8, 1993. There are two minor children issue of this marriage, Peter, born January 5, 1995, and Shawn, born December 23, 1995.
5. Mr. Arens has been employed by the State of Connecticut for nineteen years. He works at a facility for children with emotional problems. He also works one day each weekend at another facility. His principal employment requires mandatory overtime on a regular basis. These two jobs find Mr. Arens working from fifty to sixty hours per week. His total income in 1998 was approximately $59,000.
6. Mrs. Arens has not worked for five years. She had been employed in the past, holding several jobs for two to four years. Her most recent employment lasted four years and paid eleven to twelve dollars per hour, to the best of her recollection. Mrs. Arens has a college degree, is thirty nine years old, and is in good health.
7. Despite adequate income, the parties filed a Chapter 13 bankruptcy petition in the spring of 1997. The five-year plan resulting from that was designed to eliminate their debt, including their mortgage debt. Mr. Arens continues to pay the amount required to retire the debt by way of a wage execution in the amount of $123.00 per week.
8. Mr. Arens testified that Mrs. Arens handled the checkbook. He was unaware that subsequent to the bankruptcy work-out she was not paying the mortgage. A judgment of strict foreclosure has entered. At time of trial the week of January 4, 1999, the law day was January 25, 1999.
9. As there is no communication of any kind between the parties, Mr. Arens was unaware of the foreclosure.
10. Mrs. Arens first testified that she has made no efforts to secure new housing, but later testified that she would instead CT Page 1158 find temporary shelter with relatives.
11. The marital home is located in Wallingford. It was purchased with a $26,000 down payment from Mr. Arens' inheritance from his mother. Mrs. Arens' financial affidavit lists the value at $143,000 with a mortgage of "$175,000+ ." Mr. Arens' affidavit lists the value as $120,000 and notes that the mortgage balance is "unknown." Because Mrs. Arens is the only party who is familiar with the foreclosure proceedings, the court accepts her figures as to the appraised value and the balance due.
12. The only asset listed by Mrs. Arens is a 1987 Ford Taurus valued at $300.00. She is currently in possession of this vehicle, which is not in running condition. Nevertheless, Mrs. Arens has a new vehicle. Mrs. Arens testified that a friend, Ed Mitchell, age thirty-four, purchased it for her use. Mrs. Arens denies a romantic relationship with Mr. Mitchell. She testified that the children do not know him well, as he usually visits after they are asleep. Mr. Mitchell has another vehicle for his own use. All documents and insurance pertaining to the vehicle being used by Mrs. Arens are in Mr. Mitchell's name. The court finds this vehicle to be an asset of Mrs. Arens. Despite the fact that Mrs. Arens lives in the family home, which remains intact since the separation of the parties, she assigns no value to the contents.
13. Mr. Arens also lists the 1987 Ford Taurus as an asset and assigns a value of $1000.00 to this vehicle. He drives a 1980 Oldsmobile, and states that the value is unknown. This vehicle has an engine that is newer than this nineteen-year-old car, but the value of the vehicle is clearly very little. He also lists a 1982 truck with a value of $600.00. Mr. Arens assigns a value of $3000.00 to the furnishings in the marital home. He notes a checking account balance of $100.00. Mr. Arens currently receives $100.00 per week from a complex partnership interest which he inherited involving several families. The sole asset of the partnership is rental property. He assigns a value of approximately $20,000.00 to his share of the partnership, but it is clear that this is not a liquid asset, as it is included in the bankruptcy. Mr Arens also has a vested interest in his pension as a result of his employment with the State of Connecticut. Exhibit C is Mr. Arens' benefit statement from the State of Connecticut. Were Mr. Arens to have ended employment with the State of Connecticut in December 1998, he would have been eligible to receive approximately $1400.00 per month in CT Page 1159 pension upon attaining age fifty-five, which will occur in the year 2020. This pension would be reduced by approximately $58.00 monthly upon receipt of Social Security.
14. Mrs. Arens receives $66.46 per week from Social Security for the minor child, Shawn.
15. The parties agree that the child support guidelines call for $439.00 per week in child support.
At the time of trial, the court was made aware that both a civil restraining order and a criminal protective order had been issued against Mr. Arens. The parties have agreed that the court may take judicial notice of those orders. The court questioned Mrs. Arens during her testimony as to the basis for those orders. She was surprisingly non-committal in her responses. She testified, in response to specific questions, that Mr. Arens had not physically abused her and did not have a substance abuse problem. When pressed, she responded that he had been "verbally abusive" — nothing more.
It is clear that the parties had problems and were not getting along. The incident that brought the matter to a crisis was described by Mr. Arens. Mrs. Arens offered no testimony to contradict this testimony. Mr. Arens testified that in October of 1997, both little boys were in the bathtub while he gave them a bath before bed. Mrs. Arens was outside in the yard. Their daughter, Michelle, who was twelve at this time, was on the telephone. Mr. Arens called out to her to bring the boys' pajamas and some diapers. When she did not respond, he told her to get off the phone. When Mrs. Arens came inside, Michelle complained about the incident to her. Mrs. Arens called the police, and Mr. Arens was removed from the home. He has never returned, and has been under court order not to return, based on the allegations of Mrs. Arens that he physically threatened Michelle and Matthew. Subsequently, Mr. Arens lost all contact with his two older children, who Mrs. Arens claims do not want to see him.
It is important to note that Mrs. Arens has never had contact with Mr. Arens since the incident described — not by mail, telephone, or any other method. The only exception to this was, for example, if she had a bill she wanted paid, she would give it to her lawyer for forwarding. Moreover, Mrs. Arens testified she had not spoken a word to Mr. Arens in the home for some time prior to the October 1997 incident. CT Page 1160
Mr. Arens was given supervised visitation with the two younger children. These visits were supervised by the only person Mrs. Arens would agree to — the husband of Mr. Arens' sister. These visits took place at the home of this brother-in-law and sister. Mr. Arens' sister, Mary Duffy, testified. The court credits the testimony of Mary Duffy in its entirety. She said the boys enjoyed the visits, loved playing in her yard, and that she observed no problems between them and their father. She last saw the boys in July. The reason Mary Duffy has not seen the boys since July is that Mrs. Arens stopped permitting visitation, in violation of the previous order of the court. In August, Mr. Arens filed motions to attempt to force visitation. Mrs. Arens came to court and claimed that she ended visitation because there was a possibility that Shawn was autistic. Mr. Arens had no idea of this, and learned of the situation in court. As Shawn was soon to be evaluated, Mr. Arens offered to delay visitation until the evaluation had been completed, in the interest of his child. The court ordered that all records of his treatment to date be made available to Mr. Arens, and that he be notified of the evaluation so that he could attend.
The court concludes that a terrible injustice has been visited upon Mr. Arens and the children. This is apparent when the contradictory nature of Mrs. Arens' claims and the actions she has taken are reviewed:
1. The first suggestion that Shawn might be autistic arose in April of 1998. From April to July of 1998, Mr. Arens, a person trained in dealing with emotionally disturbed children, continued to visit with Shawn and found him to be a happy little boy. Mrs. Duffy observed the same, and saw no change in him during this period. Regardless of Shawn's situation, there was clearly no reason to stop vitiation in July.
2. Mrs. Arens testified repeatedly that the worst thing for Shawn in his situation is change of any kind — this to support her desire for sole custody — yet it was she who made radical change in his schedule by abruptly stopping visitation.
3. By ceasing to speak to Mr. Arens for months while he remained at home, Mrs. Arens made it clear that she wanted nothing to do with him. She seized upon the first pretext she could find to get him out of the house by claiming he had threatened Michelle. The court credits Mr. Arens' uncontradicted CT Page 1161 testimony concerning this event, and finds that there was no reason for him to be removed from his home.
4. Mrs. Arens claims that Mr. Arens has no interest in the children, yet she did everything possible to keep him from them. Mr. Arens was clearly terrified of the court order, and was fearful of a violation. He was barred from the older children by the court order obtained by Mrs. Arens, yet she now claims he has no interest in them. It is clear to the court that Mr. Arens did everything humanly possible, within the confines of the court orders, to maintain a relationship with his younger children. Mrs. Arens says he has no interest in them, and yet she stopped visitation on the pretext of Shawn's situation.
5. Mrs. Arens testified that she does not think Mr. Arens should be permitted to see Shawn until he is "part of the structure of Shawn's life," yet her actions have been designed to exclude him from the "structure" of Shawn's life. Most egregious is her action in not telling him immediately in April that Shawn might have a problem, and then stopping the visitation while claiming that the therapists advised that change was detrimental to his situation.
6. While still claiming that change is the worst thing for Shawn, Mrs. Arens did not tell Mr. Arens of the foreclosure, and testified initially that she had done nothing to find another home or to prepare Shawn for a move. This is contrasted to her claim that she can take him nowhere without extensive preparation. Exhibit B is a picture book prepared by Mrs. Arens. She says she must prepare Shawn to go anywhere by showing him these pictures in advance, outlining each phase of the excursion. Exhibit B outlines a trip to the library. With the foreclosure days away from the hearing, it defies all reason that a trip to the library had been carefully plotted, while a move from a home where Shawn has always lived has been ignored.
7. Mrs. Arens complained during her testimony that Mr. Arens was not on time picking up and returning the children, yet she also admitted she never communicated this to him. She also admits that she has cancelled visits due to claimed illness. The testimony shows this was sometimes done with only an hour's notice.
8. Mrs. Arens complains that Mr. Arens was not participating in Shawn's therapy enough, yet the testimony shows that most of CT Page 1162 this therapy was done in the home from which she had him barred by court order.
9. When Mrs. Arens came to court in June on her previous counsel's motion to withdraw, she proposed unsupervised visitation to give her time to get a new lawyer. (Transcript, June 4, 1998). This is hardly consistent with her prior insistence that the children be protected by supervised visitation. It is noted that this occurred shortly before she stopped all visitation, and well after it had been suggested that Shawn had a problem.
10. Mrs. Arens had Mr. Arens arrested in October 1987. In response to the court's questions, she claimed he had been verbally abusive. Nevertheless, Mrs. Arens also testified that not a single word had passed between them for some months prior to this event.
For the reasons stated above, and based upon further findings of fact herein, the breakdown of the marriage is attributable to Mrs. Arens.
As previously noted in the findings, the parties are essentially without assets and are about to lose their home. The testimony also shows that they had previously lost a condominium, and that Mr. Arens paid the deficiency resulting from the foreclosure of that unit. Mr. Arens then used an inheritance from his mother to make a $26,000.00 down payment on their current home. Despite adequate income, the parties have lost two homes. and declared bankruptcy. Through all of this, Mr. Arens worked fifty to sixty hours per week and trusted the finances to Mrs. Arens. The evidence shows that, after the bankruptcy work-out, while Mr. Arens was having his pay garnished in the amount of $123.00 per week — almost $6400.00 per year — Mrs. Arens was not paying the mortgage. She denied retaining records, yet some checks that were available, which became exhibits, show frivolous expenditures at a time when their home was in jeopardy. In April of 1997, she wrote checks in excess of $500.00 for Michelle's horseback riding, and $73.00 to a candy store called Nutcracker Sweet. In June of 1997, she wrote checks to Nutcracker Sweet in excess of $100.00, and spent $338.00 on magazine subscriptions and horse shows. In July and August of 1997, she spent $526.00 on candy and horseback riding, and in April and September of 1997, she spent $487.00 on magazine subscriptions, candy and horseback riding. Mrs. Arens testified that horseback riding was very CT Page 1163 important to Michelle. The court inquired what Michelle was doing now that she no longer had funds to pay for this activity. Mrs. Arens replied that Michelle works in the stable in return for her riding lessons. Presumably, this arrangement could have, and should have, been made earlier.
This is a marriage that lasted four years, before Mr. Arens was ordered to leave his home. He left with nothing, and will now lose his investment in his home. Moreover, he may well be responsible for yet another deficiency judgment. At the trial, he asked for little more than ten collectors' radios, which he had left in the home. Mrs. Arens said she doesn't have them, and that her son, Matthew, had sold them. Insofar as Matthew is a minor, the court is compelled to attribute this loss to Mrs. Arens.
Mr. Arens presents as a reasonable, surprisingly stoic individual, despite the losses he has suffered over the past months. He clearly cares deeply for his children, and accepts responsibility for their well-being. When the court questioned counsel as to what effect the dissolution of the first marriage of the parties might have on the issue of supporting the children, Mr. Arens indicated, through counsel, that it is his intent to support all four children in accordance with the guidelines, as he has done to date. Sadly, it appears that his relationship with the two older children will be very difficult to repair, because of the actions of Mrs. Arens. Nor is there any hope, in the opinion of this court, that there will ever be any form of communication between the parties.
Based on the findings stated above, and the facts alleged in the complaint, which the court finds to have been proven, the following orders are hereby entered:
1. The marriage of the parties is dissolved, and each of them is declared to be single and unmarried.
2. Mr. Arens shall pay to Mrs. Arens $439.00 per week in accordance with the child support guidelines. These payments shall be made by way of an immediate wage execution.
3. Mr. Arens shall continue to provide the current health insurance coverage, or its equivalent, for the benefit of the minor children. The provisions of § 46b-84 of the General Statutes are made expressly applicable to the parties and the minor children. Each party shall pay one-half of all uninsured CT Page 1164 medical and dental expenses incurred by or on behalf of each of the minor children. Such bills are to be forwarded directly to Mr. Arens by Mrs. Arens. No health care provider is to be required to send any bill directly to Mr. Arens. Mr. Arens shall not be responsible for any health care expense unless the bill is forwarded to him by Mrs. Arens.
4. Mr. Arens shall be entitled to any item of the household furnishings not necessary to the health or maintenance of his children, should he so choose. He shall provide a list of these items to Mrs. Arens within thirty days, and shall retrieve them on the Sunday following Mrs. Arens' receipt of notice. There is no evidence that the furnishings are not intact, other than the missing radios. Should any item on the list no longer be available, Mrs. Arens shall be responsible for the fair market value of said item.
5. Any life insurance currently held by Mr. Arens through his employer shall be maintained for the benefit of the children so long as they are minors.
6. Mr. Arens shall retain all rights to his pension. Any value which said pension might have upon his death shall be held for the benefit of the minor children.
7. Mr. Arens shall be entitled to claim all minor children as dependents for state and federal income tax purposes.
8. Custody of the minor children is awarded to the parties jointly, with Mrs. Arens having primary residence. (The court is not optimistic that this arrangement will be workable, but makes this order due to Shawn's situation and the fact that he should not be separated from his brother who is only eleven months older.) If the bitter lack of communication between the parties should result in difficulty to Mr. Arens in effectuating visitation and reestablishing a relationship with his two younger children, it is possible that the only ultimate solution will be to award sole custody to Mr. Arens upon his motion to that effect.
9. Visitation will be immediate, reasonable and liberal. Mr. Arens has demonstrated that he will act in the best interests of his children at all times, and is entitled to this order. He will be absolutely entitled to have the children on alternating Christmas days, beginning with Christmas of 1999. On any year when a party does not have the children on Christmas, that party CT Page 1165 will have the children on Christmas Eve until 10:00 p. m. All other holidays will be similarly alternated, except that Mrs. Arens will have the children on Mother's Day, and Mr. Arens on Father's Day. School vacations will be similarly alternated, and Mr. Arens will be entitled to have the children for one-half the summer vacation, should he so desire. Again, because of the lack of communication between the parties, the court suggests, but does not order, that Mr. Arens provide Mrs. Arens with a proposed schedule for the year.
10. Mr. Arens shall be entitled to have any of the minor children reevaluated to determine any physical or emotional problem they may currently suffer. Mrs. Arens will be given notice, and all reports from said evaluations. The expenses incurred will be covered as any other medical expense as ordered herein.
11. Mrs. Arens will give Mr. Arens immediate notice of any problem encountered by the minor children, including, but not limited to, problems at school, emotional problems or physical problems. Mr. Arens will do the same for Mrs. Arens.
12. Insofar as the down payment for the home that is now in foreclosure was not an asset of the marriage, and since monies available to keep the mortgage current were directed to non-essential expenses by Mrs. Arens, Mrs. Arens shall hold Mr. Arens harmless for any deficiency judgment in that foreclosure action that may enter. This obligation shall not be dischargeable in bankruptcy. (As noted herein, Mr. Arens satisfied the prior deficiency from his own funds.)
13. No alimony is awarded to either party.
_________________ Dunnell, J.